was filed, as you know, and was removed to the Middle District of Louisiana. I am Michael Palmentier of the firm of DeGravel, Palmentier, Holthaus, and Frugier, and I'm here for Dr. Ioppolo, mostly probably to answer questions you may have. When I've explained this case over the years, and I ask someone to give me ten minutes of their time, they usually respond, that's the longest ten minutes I've ever spent, because it is a hard one to grasp from a factual standpoint. We've done everything we can to give you the shorter version, Your Honors, in our briefs. But suffice it to say that this is a suit brought under Louisiana defamation law, as well as the panoply of recoveries, plaintiff-oriented recoveries, that are available under Louisiana state law, including intentional infliction of emotional distress and other such remedies. We were removed to Judge Ralph Tyson's court. This is significant for the Court's purposes because, as you may be aware, Your Honors, Judge Tyson has passed away. During this case, unfortunately, he was in the throes of his final disease and unfortunately passed. And so it came upon the responsibility of Judge Brady to pick up this complex matter, after a number of factual determinations had already been made. We are here before you now appealing the granting of 12B6 motions on the part of an entity called the American Association of Neurological Surgeons. And we are here asking the Court further to review the granting of summary judgment against the two claiming individuals, complainers, we've called them the complaining doctors, who made allegations against Dr. Ioppolo which were false and were per se defamatory under Louisiana law. Okay. With regard to the AANS? Yes, ma'am. Are you relying only on the publication of AANS to its own members? No, ma'am. Both that. Certainly we do that, Your Honor. We rely on the publication to their own members, but also the failure of them, of that organization, to regulate the dissemination of that information that they generated in their report to persons outside of their membership. As just as the Court held in Austin v. AANS, the remedies for defamation remain available to plaintiffs in these cases, and that's the only remedy the plaintiff had once these defamatory statements were made by the AANS. I'm trying to figure out. It seems that AANS did not make an initial publication to anyone outside of its organization. The record will reveal, Your Honor, that they did. Who did they publish to? Well, they allowed both Romana and Cuff to make those allegations outside of their organization, and they refused to instruct them to withdraw those publications, making them tantamount to being their allegations. So you're relying on Romana and Cuff's publications for the liability of AANS? Not only that, Your Honor. They also produced this false report, and with false statements in it by themselves, to their own membership, which is 6,000, as I recall. But I asked you, first of all, are you relying upon their report to their own members? I am, but not exclusively. But I don't think that you can rely upon Romana and Cuff's publication of the report as a publication being one that gets liability for AANS. Understood. I don't think that you—I think you may have even waived that by not briefing that before this Court. Well, Your Honor— Will you respond? Well, first, we believe that our 30-page brief certainly included our allegations that the AANS implicitly approved of this publication by not having instructed their members not to use it, both in terms of their rules, their bylaws, the requirements that they have. There was no requirement that their report not be used. For example, they could have said to their membership when they sent it to their membership, this is not to go beyond our membership, but they did not do that. What's more, they made false statements in that report themselves, and when asked to withdraw—rather, to instruct Romana and Cuff not to make the kinds of allegations they were making to the public, they refused to do so at their Board of Governors meeting here in New Orleans shortly after this lawsuit was filed. Do you have any authority for the proposition that statements made to your own members could constitute defamation? I've been looking at the statement and numerous other things on this, trying to find something on this, because we only have an unpublished case about employment law that we don't have to follow and may not be directly analogous, so I'm trying to figure out what authority do you rely upon that publication to your own members could be defamation? Well, Your Honor, as I stand here, I can't recall the exact case names, but I had the privilege of speaking on the issue of defamation extensively at the end of this year, and it is clear under Louisiana law that defamation by implication is alive and well. You cannot make false, knowingly false, defamatory statements against one of your members and then allege, but it's private, and it doesn't go beyond the realm of— I'm not sure I understand what they published. As I understand it, they had like a complaint committee, much like our bar complaint committee, that had a hearing and wrote a report after the hearing, and is that what they circulated? Yes, Your Honor, they did, but Buran and Cuff now went way beyond that. I'm talking about AANS now. Yes, they did circulate that, Your Honor, and refused to— More or less like reports we see in the Louisiana Bar Journal where they say lawyers disbarred because he withheld clients' funds, didn't remit client funds, whatever. Same kind of—that would be just about the same thing. The only thing I would say, Your Honor, is that it's different in that there was no court proceeding here. It was a panel of six doctors who were here. But, yes, this was like that. It was published and, by the way, published before it was made final, and I think we'll hear the argument that— and I wanted to reserve a good solid chunk of—because I have a number of, I know, arguments I'll have to respond to, but seven minutes if I can, Your Honor.  You can go on to your next question. We—I believe we'll hear the argument that this procedure was private and privileged, but what I think you'll see in practical reality is you can't send out the report to 6,000 physicians nationwide and internationally, or 4,000 or however many it was, and not expect it to be considered to be a publication of that report. I mean, it defies logic to suggest otherwise, and Louisiana law recognizes the notion of defamation by implication. This is defamation per se as well, and that's why these motions— Aren't these statements couched as opinions, though? That's—I'm glad you mentioned that, Your Honor, because— Let me ask you this. What if there's all these websites now where you can evaluate doctors. If someone leaves a comment that says, oh, I didn't think this doctor was very good, she didn't know what she was doing, that seems to me just like an opinion, and these people are providing opinions about what they thought of your client. Well, in this case, Your Honor, that's been argued that these were mere opinions. These were much more than opinions. First, beginning with Drs. Romano and Cuff, they took this very well-known physician who worked very hard to give the opinion that he did and accused him—not, in my opinion, he was guilty of perjury. They accused him of perjury without question, and they introduced into the record false statements of that, such as polling the jury. They claimed to have polled the jury, and the jury was so-called confused. That had an undeniable effect on this group. That was a false statement. Another false statement made by them. In their statement to the PCC, they claimed that the doctors— They did not talk to the jurors at all? There is no evidence that they talked to the jury. Okay. Go ahead. I'm sorry. And when we asked them to talk, whether they talked to the jury, they were equivocal in their deposition, and we cite that in our brief, Your Honor. So, you know, the broader picture here is the effect of the granting of these motions. I mean, the brief shows you the reasons why they're technically incorrect, but I think there's an important policy consideration to be made by this Court in this case, and that is that this review, as it were, has an undeniably chilling effect on the willingness of witnesses to be witnesses. We all have the kind of problem in Louisiana that we have in other jurisdictions where you can't get local doctors to testify in cases because the bar— I mean, the doctors all in solidarity say, we're not going to testify, and then you have to bring in some expert from some really faraway place, and then they cross-examine the expert and say, you're from really some faraway place, and then, you know, try to make the jury not like them. Does that happen in Louisiana? Your Honor, it definitely does, and as a veteran of 40 years of working on some of these cases, as Judge Davis knows, my father was a surgeon. I'm very circumspect about the cases I do take, but it is—it's called the conspiracy of silence. That's a plaintiff's catchphrase, so take it with a grain of salt, but it is clear that it is very difficult. It gets more and more difficult to find doctors willing to do it. For example, in this case, Dr. Flynn, who would be a witness at this trial, used to give opinions. He doesn't do it anymore because of the threat of sanctions, and that will be part of the evidence that we'll adduce. The long and the short of it is this. These—first of all, the 12B6s shouldn't have been granted. Judge Tyson, God rest his soul, had a hearing, and the transcripts in there is very interesting. It was some of the most colorful testimony that's ever been given in any case that I've had, where a doctor says—another doctor says, well, it's not correct to say that there's not a hematoma pressing the court. That's one of the undeniable false statements made by the PCC and by the defendant doctors. No self-respecting neurosurgeon could possibly find a hematoma here. Well, Dr. Partington put it in front of the judge and showed it to him. The judge saw it. Here was a ruling that's important in the TRO. The judge found that there was reasonable possibility that we would be able to prove our case, and in a 12B6 he denied the defendant's, Romano and Cuff's, original 12B6 motion. They got a—somehow procedurally got a second bite at that apple, and the new judge, frankly, who I think tells it all when he says it's time to put this case to bed, I think he didn't want to have to deal with the complexity of this case and found an easy way to do that by granting the 12B6. We believe—the judge, for whom I have tremendous respect, did not look at the full record. If he had, he would have seen that we—you can't plead under Iqbal or any case more definitively a 12B6 cause of action under Louisiana defamation and the other causes of action that we— Except for the fact that there's no authority for the proposal. It's novel to say an organization to its own members. Also, there's not a lot of authority about what is science, although we have scientific opinion, although we have some cases. Although your best statement, I think, is Dr. Iapulla gave false testimony, which was not supported by any medical literature in this case. That is actually a statement that is checked for true or false. There either was medical literature or not, and he either gave false testimony or not. That's not a scientific opinion. But that's the only one that— Well, with all due respect, Your Honor, I think there are numerous examples of things that are false in their statement. We're not relegated to merely scientific conclusions. We are relegated to those things which were false. And they made false statements upon which they then built an opinion. Defamation isn't a simple one-step process of saying this was false. Instead—and making a statement that is false. Instead, it can be extremely complex as the cases that can be simple, like Kennedy, the case in Louisiana that is the most recent and most predominant Supreme Court pronouncement. But there are numerous cases, some out of Lafayette, for example, in which there were several different allegations made by the defendant in the case of inappropriate conduct on several different occasions. This is an example of a year's worth of statements going back and forth, of attempts on the part of Dr. Iappolo before he was represented by counsel to defend himself. And every opportunity was given to the PCC and every opportunity was given to Drs. Romano and Cuff to withdraw these statements. That's why we filed this in state court. We pled it below $75,000. The ANS, the AANS is the one who said, no, it's worth way more than $75,000 if Dr. Iappolo's allegations are truthful. They're the ones who removed it. We tried through TRO to—as Judge Tyson said to me, he said, you're the first plaintiff lawyer I've ever seen who's admitted to trying to reduce the amount of recovery. And he said, come on now, there's a plaintiff lawyer. What's your best IED case? I've gone through all the Louisiana ones to try to find one that's about a professional situation, and I don't find one. What's your best IED case? Well, Your Honor, I don't have that. I can supplement with your permission. The point is that the intentional infliction of distress is real. I mean, the cause of action exists under Louisiana law. Whether—in this case, I mean, this is just a unique fact pattern. Whether—but we do cite all the cases in our brief to argue that the cause of action for intentional infliction of emotional distress is alive and well in Louisiana, and it clearly is. You have a red light, Mr. Parmentier. Thank you very much. Thank you, Judge. You have some time left for rebuttal. Thank you. Thank you, Your Honor. Jim Percy on behalf of the American Association of Neurological Surgeons. First of all, I want to make sure that I repeat, and I know this is repetition, the American Association of Neurological Surgeons, the association, is a private, voluntary, professional organization. I say that because the law in Louisiana and in the federal courts is courts rarely will interfere, absent some compelling interest or some compelling reason, will rarely interfere in the internal operations of those types of organizations. Judge Elrod, your point was very well taken, and it was a bit of a surprise to me to hear a lot of discussion about the defamation claim against the AANS, the association, because there is not one word in plaintiff appellant's brief about the defamation claim asserted against the association. Not one word. Well, I think he says that there's a direct claim that you could sue against for your own members, but I'm not sure that he . . . And there may be. So, can you give me your best case or any authority that would say that you cannot have defamation when it's to an organization within the organization? Well, and I'm going to answer that. First of all, the Nat case, and you referred to the Nat case, the Fifth Circuit decision. That's not really an organization. That's an employment situation, and it's an unpublished case. So . . . But . . . It's not really analogous. Well . . . It might be logically analogous, but it's not. I'm looking for something about a professional organization in defamation. And we do not find any case about no defamation claim in this situation. However, there is a potential issue here that has not been addressed yet with regard to the publication of the membership. There's only one reason why that report was published to the membership, and that is because Dr. Iapola invoked his right to appeal the decision, recommendation by the PCC, went to the board, the board voted on the sanction. There is a right to appeal that. That appeal goes to the membership. That is the only reason it was published to the membership. It had to be published to the membership so that the membership could vote on the appeal that was invoked by Dr. Iapola. Dr. Iapola knew what the procedure was in invoking his own appeal. That's why . . . And there are cases about publication within an association, within an employment situation, as you've recognized. That's not publication outside of the organization, which would constitute defamation. That's the point. It was the ABA, and it was in the ABA journal that someone said this person gave false statements to a court and didn't cite a single case. And really, in fact, there was some evidence that they had cited a case and that what they said was true. Would that be actionable? Or at some point, does the organization get so big and so national and so big that it does, it could constitute, or as long as it's under the umbrella of an organization, you can say whatever you want? Well, and we're not suggesting that as long as it's within, you can say whatever you want. However, in this case, when you invoke the very procedure which requires the organization to publish the report so that the remainder of the membership can vote on it, that cannot be defamation because it is within the organization. And again, there is no suggestion, not in brief, nowhere, that the association ever did anything in derogation of its own rules. There's no allegation in this complaint that the association ever did anything like that. We don't have any authority, though, that would give me comfort to announce . . . Your Honor, that's it. That's where it is. So what . . . I'm sorry, go ahead, Judge Davis. I mean, there is a general good faith defense, though, isn't there, where, say, an organization has an interest in policing its members and after a hearing, if they find some reason to disseminate information that would relate to the integrity and competence of their members, that they can do that? Absolutely, Your Honor. In fact, the plaintiff appellant has even asserted that, that at the conclusion of this, the association, the AANS, would have had a moral obligation to report this if that was their finding. That is absolutely correct. And that is the flip side of the compelling interest. The Austin case out of the Seventh Circuit, which was an American Association of Neurological Surgeons case, dealt with this very same issue and discusses, the Seventh Circuit discusses, the compelling interest of a professional association like this in policing precisely this sort of activity. All of these are neurosurgeons. These are not members of the public. These are not, with all due respect, judges who may not be fully well versed on the scientific or the medical aspects of this. All of these individuals on the PCC, on the board, and the members of the association were neurosurgeons. The final issue, because I know I'm running out of time, the only two issues in the brief of the plaintiff appellant addressing the AANS were abuse of process, intentional infliction of emotional distress. The court was absolutely correct. Judge Tyson originally was going to grant the 12B6 motion we originally filed, gave plaintiff an opportunity to amend, which the plaintiff did, and then we refiled our 12B6. Ultimately, Judge Tyson died and Judge Brady granted the 12B6 motion. Two paragraphs are devoted to the abuse of process, which Judge Brady found was there is no legal process here. There's no allegation against the association of an ulterior motive. But most importantly, and I mentioned this, there's no act in derogation of its rules in derogation of its own process. And then all that we have on the intentional infliction of emotional distress is formulaic, conclusory allegations. This court and the middle district has routinely held you've got to have more, particularly for an intentional tort of that sort. Those are the only two issues. This is all in your brief, and we understand. Thank you, Your Honor. Thank you. All right, Mr. Cronin. Good morning, Your Honors. My name is Stephen Dale Cronin of Guglielmo Marks, Schutte, Terhoven, Love, and I represent Mark Cuff in connection with this matter. Since we have the two individual doctors, to simplify this, I'm going to discuss the 12B6 motion that was granted, and Mr. Brasavage is going to discuss the motion for summary judgment. Plaintiff's counsel in his original argument stated that somehow it was inexplicable that the doctors got a, quote, and as we pointed out in our brief and as Judge Brady pointed out in his well-reasoned ruling on the 12B6 motion, the issue of prescription had never been raised, and that was the primary focus of that motion and is fairly undiscussed by plaintiff in his briefs. The fact of the matter is it's very clear that all of the claims that were asserted that were raised in the renewed 12B6 motion are all tort claims, and under Louisiana law, they're all subject to a one-year statute of limitations. And this includes defamation claims. The 12B6 ruling was very clear and very specific that the plaintiff's defamation claims for any publications or statements made by Drs. Cuff and Romano, and again, we're not saying they were defamatory, but even if they were, that any made before February 9, 2005, which was one year prior to the filing of the state court suit, are prescribed. Now, if you break down most of what Mr. Palmentier spoke of in his argument to this Court this morning, all have to do with statements made by Drs. Cuff and Romano in their correspondence to the AANS and before the PCC. All of that occurred before that one-year deadline. All of that is prescribed. So the Court was correct in finding that those claims are gone. The district court only found that some of the statements were prescribed. But since we're talking about prescription, let me ask you about that. Sure. Under Louisiana law, the prescription period does not start at the time of publication. It starts at the time the plaintiff learns of the statement. Correct. And so the Court used December 28, 2004 as the date, and that was the publication date. That was the publication of the report, yes. And that's not when the plaintiff alleges that he became aware. Well, let's – And so you have to have – I mean, we're talking about 12B here or something, too. And that's certainly true, Your Honor. And in that respect – but the fact of the matter is that the plaintiff was, shall we say, a little cagey in not giving a specific date of any type of publication. In fact, it was only in the renewed or the amended complaint that we ever got any kind of a date out of the plaintiff. But what is important is that there are allegations contained in both of the plaintiff's complaints that he participated in the PCC process that preceded the issuance of that report where the alleged defamatory statements were made in his presence by Drs. Cuff and Romano. So the December 28, 2004 publication date in and of itself may not be the date, but it is a clear benchmark to show that the plaintiff was fully aware of the purported defamatory statements being made against him prior to that date because Drs. Cuff and Romano had no involvement in the PCC AANS investigation or appeal process after the issuance of the PCC report. Okay. Who do I – to the extent that we agree that there are at least some claims that are not prescribed. Correct. Do I ask you or do I ask your colleague about the fact that at least one of them does not appear to be a scientific opinion? Your Honor, I'll be more than happy to address that. I just want to try to make sure that within my time I'm addressing any of the court's concerns. So I should ask your colleague. Well, let me go with this other one and then we'll just see if I have some time. I just didn't know who the person was to ask. Okay. Certainly. But again, Your Honor, overarching over everything is the issue of prescription. The issue of abusive process. The court granted it as to AANS. Mr. Percy discussed that. Judge Brady is very clear on that. And the plaintiff did not provide any argument to the contrary showing any case in Louisiana law where an abusive process cause of action exists in anything other than a judicial process and that's not what this was. So that's out. Well, then you've got the abusive rights claim. Again, there's almost nothing in the plaintiff's briefs about that. But regardless of that, to the extent that there was any abusive rights, and again, we're not saying there was, all of that preceded the issuance and publication of the PCC report on December 28, 2004. And therefore, those claims would have prescribed as well. Now, the court did not get to that issue. The court found that there was no abusive rights anyway based upon the allegations contained in the plaintiff's petition and we would agree with that court's ruling. But even if this panel finds that's not the case, the claims are still prescribed and they're out. Now, in terms of the example that Judge Davis had given regarding that this is kind of like a bar complaint, I would respectfully correct in just one instance and that is that the PCC report is similar to the report from the Office of Disciplinary Counsel. It's not the actual sanction by the Supreme Court which has further hearings and everything in connection with the recommendations of the Office of Disciplinary Counsel. That's what the PCC does. It's a panel that takes the complaint, does an independent investigation, has both parties come in, present evidence, present their sides of it, and then they independently come up with their own conclusions about what happened or what didn't happen. And then they will recommend a sanction, which is what happened here. Well, that's what ODC does. ODC takes the complaint from a lawyer, they investigate it, and they say, yes, it happened, no, it didn't. They say, yes, it did. They send it up to the Supreme Court for consideration and here's our recommended sanction. Well, if you go to the ODC's website right now, you can look on the side and there are hyperlinks that will take you, any member of the public. It's not restricted to just the members of the bar. Click on that and you can see what the recommendations and report of ODC are. So, let's get back to the cause of action here in the 12B-6. The only claims that are made other than dissemination of the PCC report by Drs. Cuff and Romano, which, and will be discussed more on the motion for summary judgment, fall under certain privileges, is the sending of a letter with the PCC report to the Louisiana State Bar of Medical Examiners. And under those circumstances, the court in this case, and I may be starting to get my opinions confused, but the court found that that letter and the statements contained therein are subject to a privilege and, therefore, are not defamatory, but even if they are, they're subject to a privilege. You have a red light, Mr. Cronin. Oh, sorry, Your Honor. I don't want to step on Mr. Brasavage. Mr. Brasavage. Thank you. Good morning, Your Honors, and may it please the Court. I'm Jude Brasavage representing the appellee, Dr. Chris Romano. Your Honors, when the lower court issued its ruling on the motion to dismiss, it dismissed all the causes of actions brought by the appellate in this case other than the single cause of action for defamation. And when it did so, it said there were several republications, if defamatory, that were not prescribed. And so that's how the case went forward, and these republications were long after the initial meeting of the PCC in the issuance of its report. So once we got that, we filed a summary judgment on behalf of not only Dr. Romano but also Dr. Cuff, and we posed to the district court this question. If Romano and Cuff merely republished to third parties a report rendered by the AANS committee charged with reviewing Iapola's Tallahassee testimony in compliance thereof with AANS membership standards, may Iapola prosecute Romano and Cuff for the tort of defamation? If the PCC report rendered after Iapola's unrestricted participation and input in the PCC panel and the AANS membership proceedings opined that Iapola's trial testimony in the Jones case violated AANS membership standards? And the district court found no, he could not, because he didn't meet the requirements of a valid claim for defamation under Louisiana law. Four very specific recognized requirements. Any, if missing, is the death knell of a defamation claim. And the district court first began by finding that the PCC report is an opinion. It's simply an opinion by a group of neurosurgeons who considered all the evidence. And the district court found that while looking at language such as the PCC considers and the PCC concludes. And based upon that, based upon this simply being an opinion, the court found that that opinion cannot serve as the basis for a successful defamation claim under Louisiana law. In addition to that, the court found that even if this wasn't an opinion, the court found no fault or malice on behalf of Dr. Cuff or Dr. Romano. Can we talk about opinion now? We have to take each one of these statements separately. We don't just kind of amalgamate them. And there is a statement that he gave false testimony and didn't rely upon any medical evidence. That is a, that is not a medical, that's not a scientific opinion. That is, we have cases that say when you say somebody lied or someone is a liar or gives false testimony, that is a possible thing for defamatory. The fact that it's in a topic about medicine doesn't take it out of that. So what do you say about that one statement? Right. And I assume, Judge Elrod, you're referring to the letter, the complaint that was filed with the LSBME, which attached the PCC report. Yes. Now, if you look at the record in this case, the first time there was an allegation other than the PCC report that served as the basis for the defamation was in Dr. Iapola's second amended complaint. And what he says is that a letter went with the PCC report. And in providing the PCC report, he says the letter, quote, specifically included in their complaint allegations of false testimony, close quote. Now, the basis of that was the PCC opinion. Right. But it doesn't matter. The letter itself says Dr. Iapola gave false testimony. That's the record 205. Right. CPC opinion, which is attached to it. It doesn't matter what you're citing. The statement itself is defamatory that's in the letter, and it's not prescribed. It's defamatory if indeed it's false. That's correct. You may have given false testimony, and that's for another day. I certainly agree, Judge Elrod, that that's not prescribed. That's what the district court found. It's not prescribed, and it's not a scientific opinion. But the district court found that, and it treated the PCC report's republication and the letter together. Well, but you don't. I'm treating them all as individual statements, as our precedent says. Sure. No, I understand. But my point is this. The district court, in looking at that, found that even if not opinion, there was no fault or no malice involved. Okay, that's why I have a question. Okay, so we'll go to Mal. So you agree with me that that one is not just a scientific opinion. Do you agree with that, or do you have a case that tells me that is scientific opinion? I think we may be dealing with semantics, Your Honor. I'm simply saying that I think Dr. Iacopolo and Dr. Cuffin sending that cover letter were saying, here's the PCC report, this is their finding. And part of their finding is that his testimony, if you look closely at the PCC report, it was inappropriate, and his testimony was not true. That was the PCC statement, and he simply sent a cover letter emphasizing that. Okay, then the court found the good faith, which is what you're going to get to next. How can you find good faith when the whole lawsuit is that they did this on purpose, they made up stuff, and they lied about it, such as the jury being polled and they gave lies to the report? How could that possibly be a good faith matter? It seems you have to disbelieve the plaintiff's theory of the case to say it's in good faith. Well, if you look at it like this, Your Honor, as any litigants come into a court or a judicial process, both sides tell their story as to what happened, and the trier fact has to make a decision and render an opinion as to who's being truthful and who's being honest and what is this true fact. Not on summary judgment if they're a conflicting fact. No, but my point is, Your Honor, this panel, the PCC panel, a group of neurosurgeons, took in all the evidence and rendered a decision, their own opinion. And all my clients were doing is forwarding on this opinion by a group of neurosurgeons to other medical societies who clearly had an interest in knowing what was said. They didn't add any more comments, personal comments about his truthfulness? Well, two things, Judge Davis. The two publications that the court found were not prescribed, one was to the LWCC, which I understand had nothing attached to it except the PCC report. The issue that I've been discussing with Judge Elrod is there was a complaint attached to the Board of Medical Examiners that attached the PCC with it, raising that issue. And the district court considered them both in finding that they don't meet the requirements of a defamation action. Okay. Judge Elrod, do you have anything else? I'm sorry. It is a separate statement in their letter. It's a cover letter that makes a separate defamatory statement. We agree, Your Honor, that there was a separate cover letter that went with the PCC report. My only point was that it was simply providing the PCC report to the board explaining what happened. And the district court considered that in finding that it didn't meet the requirements of a defamation action under Louisiana law.  Thank you very much, Your Honor. Thank you, Your Honors. Mr. Palmate, back to you. Thank you, Judge. Consider, Your Honors, the irony of Romana and Cuff, the complaining doctors, standing here saying all we did was forward a report to various entities, including my client's employer, and he lost his job, including the Louisiana Board of Medical Examiners. Consider the irony of them saying all we did was forward a conclusion by the PCC when the conclusion by the PCC was based on lies, misrepresentations, falsehoods of all kinds. And we've shown you those falsehoods in the brief, including medical conclusions, and this is where the AANS comes in. The AANS, six members of the PCC, five of them reported, and those five said something that was false, medically false. You cannot look at this X-ray and find a hematoma compressing the cord. We should remember that this is about a 10-year-old boy who became quadriplegic because a doctor didn't follow the rules. Why isn't that just a difference in opinion in interpreting the X-ray? Well, it would be if they said something like, you can have differences of opinions. That's not what they said, Judge. And I really ask you to look at what the report says. They say no neurosurgeon could find. Well, that's not an opinion. Because opinions allow for the possibility of other opinions. Well, we understand, Judge. And that's not the only thing that they did. They also relied on hearsay. See, because now we get for the first time this reliance on the analogy between the Office of Disciplinary Counsel of the State of Louisiana and for the judges who are not familiar with that, you have due process there. You can't just introduce anything. I mean, the rules are a little different, but you can't just introduce hearsay. And in this case, before the PCC, they talked about polling the jury, which was false. We're not going to tell the organization what it can do when it's doing its process. We're not supposed to do that. But what I want to ask you is when does the record say that your client became aware of the PCC report? It's rather vague. You say it wasn't at the time of publication, but when did they become aware? So that I can properly calculate the prescription period. Here's when I think my client became aware. According to the record. Well, it's in the record, Judge, that it was not official until the board ruled here in New Orleans that, actually, until San Francisco in 2007 when the membership ruled the way it did. When did they become aware of the existence of the report? Not when was the report adopted by everybody in the whole group, or when did your client become aware of the report? Well, Judge, I'd have to go to my file to be able to find exactly when, but I would submit to you as well after the time that the one-year statute of limitations in Louisiana ran. But the statute of limitations in Louisiana, Your Honor, and this is very important, it does not, it continues in these defamation cases. You can't defame someone and then continue to not withdraw what you said and continue to have it published and not, as the judge said in the district court, you can't unring the bell of defamation. So, again, the irony of this is that what their argument is that Dr. Iapola had to sue his own organization while they were reviewing his conduct. Now, that's not, that doesn't make much sense from a logical standpoint, nor does it make much sense in terms of strategies to sue the entity that you're hoping will not suspend you. So, with all due respect to counsel and the arguments that have been made, prescription really has no role in this case because even to this day those statements haven't been withdrawn, they're still being made, they're out there in the public eye. And we tried to have it stopped, as the court is aware. We had a TRO in the state district court ready to go and then we got removed. And then we had a TRO in the middle district of Louisiana and it, unfortunately, got delayed. And so it grew like topsy and, unfortunately, we weren't able to stop the impact of the defamation. The long and the short of it is this, Your Honors. There is a policy consideration before the court today, and that is whether or not a private organization is going to be able to interfere with the finding of expert witnesses, especially in a state like Louisiana where, without it, it is a statutory requirement that the case be dismissed. Without an expert witness, I'm not sure whether it's that way in Texas or Alabama or any of the other states in our vicinity or Mississippi, but without an expert, you get dismissed on summary judgment. So we have to find an expert. Now these organizations get to go out there and sanction people. A sanction's not a slap on the wrist. It has to be reported to the national organization, the reporting organization. It can, in turn, undermine a person's license. This has a hugely chilling effect, and we hope that this court will help us remedy that chilling effect on putting experts before. Thank you, Mr. Parker. Thank you.